JEROME KEELEY ET UX. v. B. M. & J. F. SHANLEY.

JEROME KEELEY v. B. M. & J. F. SHANLEY.

APPEALS BY DEFENDANTS FROM THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY.

Argued February 2, 1891—Decided February 23, 1891.
[To be reported.]

1. When the use of a steam rolling machine is necessary in the lawful construction or repair of a macadamized roadway, upon a highway already open for public travel, such use is lawful, and it is not negligence per se to permit the machine to stand on the highway at rest, over a Sunday, when a reasonably necessary incident of such use.

2. The provisions of § 2, act of June 30, 1885, P. L. 251, requiring persons using steam machinery upon highways to perform certain duties upon the approach, in either direction, of any one traveling in a vehicle or with a team, apply only to the operation of the machine, and do not

Statement of Facts.

regulate the duties of the owner when his machine is at rest, at night, or on Sunday.

3. In the latter instances, it is the duty of the owner who lawfully leaves his machine on the highway, to place it in as favorable a location as possible, with a view to avoid accidents, locating it near one side of the road, so as to give the traveler all the space reasonably convenient to pass by; but the law does not exact impossible or unreasonable things.

(a) A steam roller, lawfully in use, in the construction of a macadamized roadway of the width of eighteen feet, in the middle of a highway sixty-six feet wide, was left standing over Sunday on the edge of the already macadamized part of the road, leaving a clear space of about thirty feet at one side. It was covered with canvas tied at the sides or corners, with no watchman in charge of it:

4. As it was reasonably impracticable, to move the machine from the hard road, and the spot on which it stood was the safest one, on that section of the road, where it could be placed when not in use, its owners were not negligent in leaving it there, and were not liable for an accident occurring in broad daylight, through the fright of a horse at the sight of the machine.

5. A traveler, who, relying upon his horse or his own ability to control it, attempts, without any other precaution than a reduction of speed, to drive past an object which he knows is well calculated to frighten the animal, cannot charge the consequences of his rashness upon others who have not participated therein nor been guilty of any neglect of duty.

Before Paxson, C. J., Green, Clark, Williams, Mc-Collum and Mitchell, JJ.

Nos. 48, 49 July Term 1890, Sup. Ct.; court below, Nos. 73, 74 December Term 1887, C. P.

On November 26, 1887, two actions of trespass for negligence were begun against Bernard M. Shanley and John F. Shanley, copartners trading as B. M. & J. F. Shanley, one of them being brought by Jerome Keeley and Kate J. Keeley, his wife, and the other by Jerome Keeley alone. The defendants pleaded not guilty.

The two cases were tried together on October 22, 1889, when the following facts were shown:

In 1887 the defendants were engaged, as contractors, in building for the Blockley & Merion Turnpike Company a macadamized road upon a highway in Montgomery county, known as Montgomery Avenue. In the prosecution of this work, it was necessary for them to use and they were using a large steam roller, weighing twenty tons. The entire width of Mont-

gomery Avenue was sixty-six feet, but the macadamized roadway which the defendants were building occupied only a space of eighteen feet in the middle of it, leaving a summer road at each side. The steam roller, when not in use, was kept standing at one edge of the completed roadway; and on Sundays, it was covered with canvas, tied down and fastened to the framework. On Sunday, October 16, 1887, it stood on the road at a point near Libertyville, the work of construction being at that time in progress in that neighborhood. It was covered with canvas on that day, as usual, and stood at the northern edge of the hard roadway. The machine was eight feet in width and occupied a little less than half the width of the stoned road, the rest of which together with the summer road south of it, afforded abundance of room for driving past. The roller could be seen at a considerable distance, by persons approaching on the road from either direction.

Jacob L. Stadelman, the secretary and treasurer of the turnpike company, being called by the plaintiffs in their case in chief, testified in substance that on account of the weight of the roller it could not be removed from the hard roadway and brought back again, without the use of side tracks or expensive appliances adapted for the purpose, and that, in his opinion, to have moved the roller further north, so as to let it stand on the dirt road, would have made no practical difference as to its being likely to scare passing horses, and the only effect of it would have been to give them more shying ground. A witness for the defendants testified that the roller could have been moved off the road and upon private property, by building a causeway, on a curve with a radius of 150 feet, either of macadam or of heavy planks, strongly bolted together; or that a "switch" might have been made of the same materials to carry it upon the side road. In rebuttal, the plaintiffs called a witness who testified that the machine had been left standing upon the summer road on at least one occasion in October, 1887. Testimony for the defendants in sur-rebuttal tended to disprove this statement. One of the defendants' witnesses testified that the roller could have been moved to another section of the road below Merionville, and kept there over Sunday, at a place where the road was wider and the banks at the side of it not so high as at the place where it was kept. The testimony

tended to show, however, that if the machine were to be left
standing anywhere on the Libertyville section of the macadam-
ized road, the place used for that purpose was the best that
could be selected.

On the afternoon of Sunday, October 16, 1887, the plaintiffs
were passing along Montgomery Avenue, going from West
Philadelphia to Bryn Mawr in a buggy drawn by a well
broken horse which Mr. Keeley had owned for about six
months. Mr. Keeley, who was driving, first noticed the roller
when he was from one hundred to two hundred yards away
from it. He testified that at that time there was nothing
about it which led him to believe that his horse would frighten
at it; that he first noticed that it was likely to frighten the
horse, when he was within one hundred or one hundred and
fifty feet of it, and he then pulled over to the summer road
on the south side of the avenue, and gradually slackened the
horse's pace so that by the time he reached the machine the
horse was about at a walk; that the only sign of fear the horse
showed, until he came right up to the roller, was that he look-
ed at it, but when directly opposite the horse turned his head
and looked at the machine and just then the canvas upon it
was flapped by the wind, whereupon the horse became fright-
ened, made a spring upward and jumped to one side, overturn-
ing the buggy and throwing the plaintiffs out, both being
injured. The buggy and harness were broken, so as to require
extensive repairs :

" Q. In your judgment was this machine on Montgomery
Avenue, as it appeared on the sixteenth day of October, such
a machine as would scare and frighten a well broken, road-
worthy horse ? A. I think it would frighten most any animal."

Cross-examined : " Q. Did you get out ? A. No, I did not
get out, because I did not have an idea that he would frighten.
Q. Then, there was nothing in the appearance of the roller,
even at that short distance, that led you to believe it would
frighten the horse ? A. Not at first. When I got close up to the
machine and the flapping of this canvas, that helped to fright-
en him, I suppose. Q. Do you believe the horse would have
frightened if the canvas had not flapped ? A. I rather think
he would have frightened anyhow at the engine, because when
he came up on the side of this engine it looked so large it was

Charge of Court below.

enough to frighten any animal, I think. . . . . Q. Did you
do anything then to keep control of him ? A. I held my line
tight and guided him as much as I could. Q. Then, just at
the point when you were just opposite the machine, you say
the canvas flapped? A. Yes, sir. Q. That was the occasion
of the spring? A. That was the occasion of his spring. He
sprang right in the air, reared right up and then sprang to the
side. . . . . Q. Then you apprehended no danger until the
actual danger happened ? A. No, sir. Q. If you had gotten
out of your wagon and led your horse past, could you have
avoided the accident? A. I suppose I might have avoided it
if I had gotten out and held on to him. . . . . Q. What I
want to know from you is, whether you say, under your oath,
that it was the machine that scared the horse, or whether it
was the flapping of the cover of the machine ? A. I think it
was both. Q. Then, why did not your horse get scared before
he got right opposite the machine? A. I do not know why
he did not get scared, but the object did not look as large as
when he got right opposite ; when he got right opposite it
looked like an elephant on one side."

Testimony for the defendants tended to show that on Octo-
ber 16th, the cover of the machine was securely fastened with
ropes and wire. It was shown that by turning off on a cross
road, about one thousand feet east of the place where the roll-
er stood, the plaintiffs could have reached Lancaster Avenue
which would have taken them to their destination ; but Mr.
Keeley testified that he was not well acquainted with the roads
in that locality, and other witnesses testified that there was no
sign up at the cross road indicating that it led to Bryn Mawr.

Mrs. Keeley testified that she was conversing with her hus-
band and did not notice the machine until they were "nearly
on it;" that she took no thought of anything, because Mr.
Keeley was a very careful driver and she was not noticing any-
thing on the road, and she could not remember anything about
any flapping of canvas, as she was busy talking.

At the close of the testimony, the court, WEAND, J., charged
the jury respecting the reciprocal duties of the plaintiffs and
the defendants, under the testimony, and answered the follow-
ing points presented by the defendants :

Arguments.

2. The evidence in this case being uncontradicted and conclusive that the defendants at their own expense moved the roller to the safest part of the road, so that all persons coming and going could see it, the traveler who sees it and passes it assumes all risks incident to such passing.

Answer: This is not affirmed, unless the traveler failed to take reasonable and proper precautions in passing.[1]

9. The plaintiff, Jerome Keeley, having testified that he saw the roller at a distance of two hundred yards, and that he considered it an object that would frighten any animal, and the evidence being that he had another road which was safe and convenient by which he could have pursued his journey, it was contributory negligence on his part to persist in attempting to pass, and they cannot recover in this action.

Answer: This is not affirmed, so far as it applies to the wife, unless you find that she was guilty of contributory negligence.[2]

18. Under all the evidence in each cause, the verdict must be for the defendants.

Answer: This is refused.[3]

—The jury returned verdicts in favor of the plaintiffs; for $200, in the action brought by Jerome Keeley, and, in the action brought by Keeley and wife, for $5,000. Rules for a new trial having been discharged,—the discharge of the rule in the case of Keeley and wife being conditioned upon the plaintiffs' remitting $3,000 of the verdict, which condition was complied with,—and judgments having been entered, the defendants took these appeals, assigning for error in each case:

1–3. The answers to defendants' points.[1 to 3]

*Mr. Irving P. Wanger* and *Mr. Charles Hunsicker* (with them *Mr. John Scott, Jr.*), for the appellants:

The presence of the roller on the road was lawful and not a nuisance per se. The rights of a traveler on a highway are subordinate to the right of the authorities to make reasonable repairs: Crescent Tp. v. Anderson, 114 Pa. 643. The necessity to use steam rollers is recognized by law: Act of June 30, 1885, P. L. 251. But the proximate cause of this accident was the negligence of Jerome Keeley himself and he cannot recover: Pittsb. S. Ry. Co. v. Taylor, 104 Pa. 306; Crescent Tp. v. Anderson, 114 Pa. 643; Forks Tp. v. King, 84 Pa. 230;

Arguments.

Perry Tp. v. John, 79 Pa. 412; Erie City v. Magill, 101 Pa. 616; Barnes v. Sowden, 119 Pa. 53. And the question of his negligence was for the court: Authorities already cited, and also Delaware etc. R. Co. v. Cadow, 120 Pa. 559. As regards Mrs. Keeley, who testified that she was not noticing anything on the road, but relied on her husband as a careful driver, the case is equally clear: Cresent Tp. v. Anderson, 114 Pa. 643; Dean v. Railroad Co., 129 Pa. 514.

*Mr. James B. Holland* and *Mr. Louis M. Childs* (with them *Mr. Montgomery Evans*), for the appellees:

The points specified in the first and second assignments could not have been affirmed, because the facts assumed in them were not uncontradicted and conclusively established: Del. etc. R. Co. v. Smith, 1 Walk. 88; Penna. R. Co. v. Bock, 93 Pa. 427. The whole case, then, is properly covered by the third assignment, and must turn upon the determination of two questions: (1) Was there any evidence from which negligence on the part of the defendants could be inferred by the jury; and (2) was the question whether the plaintiffs were guilty of contributory negligence for the jury, in the circumstances of this case?

1. It is clear, beyond the possibility of a doubt, that this machine, standing upon the roadway, was a source of extreme peril to persons using the road with well-broken and roadworthy horses. By § 2, act of June 30, 1885, P. L. 251, the duty is imposed upon persons using such machines, to have somebody in attendance to assist travelers in passing, and they are also required to move them as far as possible from the middle of the traveled road whenever a vehicle or team approaches from either direction. It is evident from a reading of the act that these requirements apply, not only when the machine is at work, but also when it is at rest; and their neglect by the defendants in this case was of itself culpable negligence. The standard of their duty being fixed, their failure to perform it was negligence per se, to be declared by the court: West Chester etc. R. Co. v. McElwee, 67 Pa. 311. However, even if there were no such positive duty imposed by the act, the defendants were guilty of negligence in allowing the machine to stand upon the road without a watchman, in the circumstances disclosed by the evidence: Piollet v. Simmers, 106 Pa.

Opinions of the Court.

95; Born v. Plankroad Co., 101 Pa. 334; Plymouth Tp. v. Graver, 125 Pa. 24; Burrell Tp. v. Uncapher, 117 Pa. 353; North Manheim Tp. v. Arnold, 119 Pa. 380. Again, they covered it with a canvas whose flappings increased the danger. Moreover, there was testimony tending to show that there was no necessity to keep it on the roadway over Sunday. This was necessarily for the jury: Citizens Pass. Ry. Co. v. Foxley, 107 Pa. 537.

2. The court would not have been justified in declaring, as matter of law, that Jerome Keeley was guilty of contributory negligence. There was no fixed measure of duty applicable to him. The measure of his duty was ordinary and reasonable care, and in such a case the standard is not fixed, but variable. It was for the jury to determine what care and caution a man of ordinary and reasonable prudence would have exercised in circumstances similar to those in which Mr. Keeley was placed: West Chester etc. R. Co. v. McElwee, 67 Pa. 311; Plymouth Tp. v. Graver, 125 Pa. 24; Born v. Plankroad Co., 101 Pa. 334; Penna. R. Co. v. Peters, 116 Pa. 206; Woodward v. Shumpp, 120 Pa. 458; American Steamship Co. v. Landreth, 108 Pa. 264; West Phila. Ry. Co. v. Gallagher, 108 Pa. 524; Pittsb. etc. R. Co. v. Rohrman, 13 W. N. 258; Creed v. Railroad Co., 86 Pa. 139; Penna. R. Co. v. White, 88 Pa. 327; Germantown Ry. Co. v. Walling, 97 Pa. 55; Fisher v. Railroad Co., 131 Pa. 292; Stager v. Railway Co., 119 Pa. 70. The cases cited by the appellants are not in conflict with any of the decisions cited by us, and are inapplicable to the present case. The case of Mrs. Keeley differs from that of her husband, and even if he were negligent, she would be entitled to recover, her uncontradicted testimony being that she did not notice the machine until the buggy had come up to it. She was not guilty of negligence, like the plaintiff in Dean v. Railroad Co., 129 Pa. 514, but is entitled to recover, under Carlisle Bor. v. Brisbane, 113 Pa. 544, if there was any negligence of the defendants which was the proximate cause of her injury.

NO. 48.

OPINION, MR. CHIEF JUSTICE PAXSON:

The third assignment alleges that the court below erred in refusing the eighteenth point of the defendants, which prayed

for a binding instruction in their favor upon all the evidence. A discussion of this assignment necessarily involves the entire case.

The defendants were the contractors for building a turnpike road on Montgomery Avenue, in Montgomery county, and were using in this work a large steam roller, weighing about twenty tons, which the terms of their contract required them to use in the construction of said road. The accident by which the plaintiffs were injured occurred on Sunday, the sixteenth of October, 1887, in broad daylight. The roller had been left the Saturday evening previous at the place where the accident occurred. It was on one side of the macadamized part of the road, leaving a clear space of about thirty feet between the machine and the south gutter line. It was covered with canvas, and the canvas was tied at the sides or corners. The place where it was left appears to have been the safest one where it could be placed when not in use. It could not be run off on the soft earth by reason of its great weight, and to have constructed platforms or lateral turnpikes on which to run it off from the road under construction would have been impracticable. The plaintiffs were driving along the road on the Sunday in question with a horse which the plaintiff Keeley had owned for some months. The roller was in full view, and was seen by the driver when distant therefrom some two hundred yards. Keeley testified that he thought it was an object that would frighten any animal, yet he appears to have taken no other precaution except to reduce the speed of his horse to a slow trot, " almost to a walk." The horse showed no signs of fear until about opposite the machine, when he looked at it, reared, overturned the buggy, threw out the plaintiffs, and occasioned the injury complained of. We do not, of course, know what particular feature of the machine frightened the horse. It was alleged to be the flapping of the canvas cover. This, however, is mere surmise, as the cover was fastened down, and the fright of a horse cannot be measured by any known rules.

I have stated the facts as briefly as possible, but I believe with substantial accuracy. Under the circumstances detailed, were the plaintiffs entitled to recover? In other words, were the defendants guilty of such negligence, in permitting the

machine to remain where it was over Sunday, as rendered them liable in damages to a person whose horse became frightened at the obstruction, ran away, and thereby caused an injury?

I think it may be conceded that had the roller been left upon an ordinary highway, not in course of construction or repair, the defendants would have been liable. We think there is a marked difference between the case of a finished public highway, thrown open to travel, and a road, be it a turnpike or an ordinary dirt road, in course of repair or construction. In the latter case there must necessarily be inequalities, heaps of stone, and other materials upon the ground necessary for such operations. The defendants were lawfully engaged in the construction of this road; the steam roller was a machine necessary for its construction. Its use, therefore, was lawful. When in operation it was a much more formidable looking object, and far more likely to frighten horses, than when at rest. The act of June 30, 1885, P. L. 251, provides for the moving of steam machines upon public highways. When in motion, "upon the approach, in either direction, of all persons traveling in vehicles or in charge of teams," it is made the duty of the person controlling it "to move such machinery as far as practicable to the right or left of the road, to a position where the said approaching vehicle or team may pass with the greatest safety, and stop the same before such persons . . . . . shall have arrived within three hundred feet of such machinery, and the owner or owners, or persons in charge of such machinery, shall assist such passing vehicle or teams until they are safely by the danger," etc. These provisions apply only to the operation of the machine; the act is silent as to the duty of the owner when his machine is at rest at night and upon a Sunday. What, then, is the duty of the defendants in the latter instances? Clearly, to place their machine in as favorable a location as possible with a view to avoid accidents; to locate it near one side of the road, so as to give the traveler all the space reasonably convenient to pass by it. The law does not exact impossible or unreasonable things. In our view, the defendants appear to have done all that was practicable to avoid accident to others, and when no negligence is shown on their part there can be no recovery.

The plaintiffs, as before stated, were in full view of the

machine for some distance before they reached it. It was well calculated to frighten tneir horse, and they were aware of it. If they did not know it, they either possessed less than average intelligence, or they must have been utterly ignorant of the nature and disposition of horses, neither of which is to be presumed. Coming, then, to the presence of such an object, an ordinarily prudent man would probably have done one of two things; either to turn back and take another road, and thus avoid the obstruction, or get out of. the buggy and take his horse by the head. In the one case the danger would have been wholly avoided; in the other, it would have been reduced to the minimum. The plaintiffs did neither. Mr. Keeley evidently relied upon his horse, or his ability to control him. He certainly had the right to proceed in the way he did. But when one approaches a known danger, which he might easily have avoided, it is not just to charge the consequences of his rashness upon others who have not participated in it, nor been guilty of any neglect of duty.

I have not discussed the authorities cited to sustain the plaintiffs' position, because I am unable to see their application. They are mostly cases where obstructions had been unlawfully placed or left upon the public highway. The distinction between this class of cases and the one in hand is so obvious that it is not necessary further to refer to it.

We are of opinion that the defendants' eighteenth point should have been affirmed.

Judgment reversed.

### NO. 49.

OPINION, MR. CHIEF JUSTICE PAXSON:

This case is ruled by Keeley v. Shanley, just decided.

Judgment reversed.